I'm Frank Uphaus on behalf of the appellant and respondent in the cross-appeal, HP Pavilion Management. One case that we didn't cite and that I do want to make reference to is a district court of appeal case, a California district court of appeal case from 2001 called Lushbaugh v. Home Depot. The citation is 93 Calap 4th, 1159. I only want to cite it for... Have you given counsel, opposing counsel, a copy of that? I have not, Your Honor. When you come to court and you haven't cited a case before, you're supposed to give the clerk a slip citing the case. You're supposed to give opposing counsel a copy of the case before you argue so that it's not a one-sided argument. What's the year of this case? 2001. All right. So you had seven years to discover that case. That's true. It's referred to in some of the Ninth Circuit cases already, Your Honor, that are... Well, if you read the Ninth Circuit cases, you would have come across it. That's true. And it's referred to in the Ninth Circuit cases that we did cite. It's just the language. It's just one snippet from the... We can go ahead this time. But in the future, A, you should discover the cases before the day before argument, and B, you should notify your opposing counsel. And I'm sorry. It wasn't a matter of not discovering it. It's the language from it that... And it's referred to in the Ninth Circuit opinions, as I indicated. What the court there said, which really is very apropos, I think, of what the issue here is, that that case dealt with Home Depot's guidelines restricting expressive activity to some designated areas. And what the court said was that the guidelines provide for an opportunity for persons with political messages to set up a table and or a sign so that anyone interested can step forward for further information. And the court then says that's all that Pruneyard requires, referring to the California Supreme Court case in the Pruneyard decision. The company need not give activists free reign to directly accost every customer entering this door. And I submit that that's precisely what the district court's ultimate injunction did in this case. Despite evidence of extreme congestion at the landing at the top of the North Entry stairs, the district court really read out of the law any kind of reasonable time, place or manner restriction on expressive activities in that area. Well, this is a 20-foot set-aside up on the left. You know, there's some qualifying language which the judge said, well, in the case there should be crowding or something of that kind. He really had some modifying language which would give aid and comfort to keeping the protesters off that 20-foot area. Actually, he didn't. No. Not in the judgment itself. Well, in the opinion I read that. I read something like that. I think what he said was in a subsequent, either it was in the context of the attorney's issue or in our request for modification of the judgment, he said that we still would be free to provide. Oh, that's part of it. To me, that's part of what the opinion is. That's in there. Let's put it that way. But it is, what it doesn't do is give you what we tried to do in putting the protocol together. And in doing that, we did it with respondents prior counsel. We tried to come up with a bright line so that there wouldn't be any uncertainty with respect to where expressive activity could take place and where it couldn't take place. And that 20-foot demarcation leaves more than half of the rest of the landing for expressive activity. I understand that. And the other thing that I think wasn't particularly clear in the … So what do you want us to do with that? Well, I want you to reverse the injunction. Because what … The injunction is for five years? Yes. When was it, when was it, when was the year of the judgment? I think the judgment was 2006. 2006. Okay. All right. And the interesting thing is, under the protocol that we had put into place, which was in effect for the circus event in 2000, I think it was 2005 or 2006, there was no problem with expressive activities on the landing. The district court also had said, and I think it's part of our problem with the way he arrived at his ultimate decision, was that the protocol effectively eliminated the ability of activists, demonstrators, or pamphleteers from engaging in expressive activities on the landing itself, which was absolutely untrue. That's just inconsistent, completely inconsistent with the evidence and with the facts. And the point, our point, was that, and here a picture is worth a thousand words, and I think it's videotaped, as well as the photographs which are part of the excerpts of record. And it's in volume two of our, of H.P. Pavilion's excerpt of records at pages 235 through 251, which demonstrates, and it's really conceded, but it demonstrates, and as the district court found at one point, that the landing area at the top of the North Steps becomes extremely congested in the period of time prior to the opening of the doors for the circus show. Q. Can I ask you something? A. Sure. Q. Was there ever in this case any affidavit or declaration or anything that showed that there was any problem of interference by the demonstrators or the picketers that had caused any difficulties? A. Yes. Q. There was? A. Yes. At the, there's, it's part of the record at the, at the Animal Open House, there is, there is in the record a videotape of a confrontation between Ms. Bulbul and one guest, a woman who was complaining that the, the message being delivered, the activities were causing her child some stress. Q. But there's nothing like that with respect to this 20-foot area at the top of the landing, right? There's no activity there by the, I'll call them demonstrators, right? A. Well, it's, well, there's activity there, yes. Was there evidence of any confrontation there? Q. Or any interference with, you know, movement of the ground, even, right? A. No. And that's, but I think that that's because most of that activity takes place in the, in the, in the forward section, not back by the doors. Q. Do you really think it's a reason to limit people's free speech rights that the child is going to be offended by the message? A. It's coming up with reasonable time, place and management, and there's manner restrictions. Q. I have a question about that. I ask whether, if somebody's got a message that offends a child, such as George Bush isn't too bright, which might offend a child. A. I'm not, I don't know what a child that that would offend, but I'll assume that, uh. Q. I would say, you know, Obama is a very intelligent person who should be elected. Now, that's going to offend some people. And if a child is offended, does that mean you can't deliver that message? A. No, of course not. Q. Well, so a child was offended by Ms. Bobel's message? A. No, it was more, no, it wasn't that the child was offended. The child was, was, was upset. What that, what that led to was a confrontation between the mother and Ms. Bobel. And it was, and that's going to happen, and that's, that's fine out in the rest of the parking lot. We understand that. What we're trying to do is restrict, on a very limited basis, the, the activity within 20 feet of the doors. Q. I must say, I'm beginning to lose my sympathy when you say it's because of the substance and the content. A. I'm sorry, what? Q. I mean, I said A. No, no, it wasn't, it was not the content of the message. And that was Q. That's what caused the problem. A. No, the question, Your Honor, the question that I was asked was whether or not there was any evidence of a confrontation. And, and yes, there was. There have been confrontations down in the area of the Animal Open House. Q. I think it was really whether there was any evidence of any interference with the access to the circus or to the animal area, or to the other main arena. Was it, were these, not were these demonstrators causing people to object to their message, but was there any, any affidavit or declaration before an injunction was requested showing that there was some interference with access? I think the answer is no, that there wasn't any. A. No, what the evidence showed was that the area at the top of the landing becomes extremely congested and that in the interest of crowd movement, in the interest of the convenience of the patrons, that 20-foot setback was devised simply at the, at the 20 feet, because what happens at the top of the landing, and you'll see it in the photographs, the crowd comes up and starts to line up before the show, before the doors open. So you have an, a large number of people in a very confined space. The crowd then, then narrows down even further inside the 20-foot area to go through the doors to get into the arena. So the only restriction is on that 20-foot area immediately in front of the doors. And it really is just a matter of crowd control and safety, as the, the HP Pavilion people testified. Q You know, let me ask you a question. Would you, for one, and I'll ask your opponents the other, this case has gone on for quite a while. A. It has. Q And it could go on for quite a while longer. I don't know whether you were here this morning when we talked about the habeas petition that was trying to get his case here. A. We were here. Q We have wonderful ways of obstructing justice by requiring parties to go up and down, up and down, and it can go on interminably. Would you have any interest in, we have an excellent mediator who meets with parties where there is some possibility of avoiding that kind of indefinite process of using the courts to resolve something that could better be resolved by the parties? After the argument, is there any, not, not, I mean, but would you, is there any possibility you think that we could be of help because our mediators have settled cases that nobody ever thought would be resolved, including capital punishment cases? A. I have never in my career turned down a court's invitation to participate in mediation or settlement discussions. Whether it would be helpful in this instance or not, I don't know. But I don't, I think we're at a point where the protocol, with all due respect, the free speech protocol that was put into effect accommodates everybody's interest. And it really does. And it was really how we got to that point was in an effort to do that. The first thing, the thing that started this case was absolutely wrong. I mean, and there's no question about that. The effort to restrict all of the parking lot, the whole venue to free speech messages was wrong. It was acknowledged to be wrong. And that's why we came up with the free speech protocol as part of the settlement with the plaintiff's prior counsel. Q I'm going to ask you about that settlement. Just one question. There was a fee award in that prior counsel. Did that go to the people who are now representing the plaintiffs? A. No. Q No. A. No. It went to prior counsel for it. Q And that was prior counsel. They got out of the case. A. That's exactly right. And so we thought that we had come up with a method that was reasonable in time, place and manner in terms of restricting access at the entrance to the arena itself, just a 20-foot setback that's consistent with the overhang there, leaving the other half, more than half of the landing for expressive activities, all of the parking lot for expressive activities, and all of the, down to the 10-foot semicircle at the entrance to the Animal Open House. Q In denying your request for the injunction on the 20-foot area at the landing, I think the district court said the main reason was because there was no evidence of any problem up there, right? Isn't that the reason? A. Well, that is as close as we got to any reason. Q Well, so let me face my question. So if that's true, regardless of what you might want or what you negotiated as your protocol with the other people, how can the district court be compelled to issue an injunction when the district court concludes, as a matter of fact, there's no problem that needs to be addressed by an injunction? A. I think that, because the district court was absolutely wrong, and what we're asking... Q There's no evidence of any, you know, disruption at that point. A. No, what the evidence up there is, is that it is extremely... Q Oh, it's crowded, of course. That's the funnel entrance point. But the point is, the injunction, I mean, the point is that's not caused by the plainness. A. No, no, it's caused by the crowds. But they're replete, California authority and Supreme Court authority, that congestion, that managing congestion is, and if you do it in a narrowly tailored way, which we think we did with this 20-foot setback, which left the rest of the landing for expressive activities, there's nobody that can't be contacted, nobody that can't be communicated with. We're not talking about setting up zones like they did in Cuba. In Cuba, with the Cow Palace case, it's exactly the opposite of what we're talking about here. In Cuba, you had these little tiny zones that this court prohibited, but still recognizing the ability to restrict numbers of people or distance in terms of crowd control, which is what this does. And as opposed to Cuba, what we have here is a large area where you can't do any expressive activities, and very large areas where you can. It's exactly the opposite. And there is just a lot of authority with respect to the ability of the property owners. Q. I just want to answer one question. A. Sure. Q. Was there any showing that the protesters bothered anybody going into the building at all? A. No. No. Q. Why are you making such a big issue about a 20-foot, not getting a 20-foot setback? If there's a problem, you know, an injunction can always be modified. And here you are arguing that the district judge was very wrong. He shouldn't have had any, he shouldn't have put in a 20-foot setback. A. There was, the, this hasn't been an issue. They put in the restriction that started all of this because they were having problems in other places. The problem at the top of the stairs is simply one of congestion. It's just a matter of crowd control. It's just a matter of crowd control in the area immediately adjacent, immediately in front of the doors. It's not, and for general safety, as the agency... Q. Let me also, like what Jeff Wright is saying, is you don't really have a practical problem. You've got a theoretical legal problem that people fight over. I can understand, you know, you think you're, the judge is wrong and you're right, which may be the case. But is it really worth all this if it doesn't cause you any problem? A. Well, where it, that's what we're really talking about? Q. Is that true? A. I don't know what we're really talking about. And that was the, we had reached a settlement that affected everybody's interest, that the district court had approved. The district court, in response to the request to modify the original injunction, had approved what we did, found that it met everybody's needs, found that it provided the bright line that you want to have. And then we end up with this litigation following our settlement. So, yes. Q. You won part of it. They didn't get their money. But you lost a little bit of it. A. Which we shouldn't have lost. Q. The whole case, about which you aren't arguing about, you're really mad about the attorney's fees, is what I'm thinking. A. Well, that's, obviously, that at the... Q. Get back so you don't have to pay any attorney's fees. A. I've already... Q. One other question. Before the final injunction was issued, did you have a chance to have a hearing before the judge? Or was this all on paper? A. No, no. We had a hearing before the judge. First, we had the jury trial. Q. Attorney's fees. A. Pardon? Q. Did you have a hearing? A. No. Q. Well, you did have a hearing before the magistrate, did you? A. No. Q. No hearing on a half a million dollars of attorney's fees? A. It was submitted on the papers. Q. Okay. As I recall. A. We did have a hearing before the magistrate the first time, with respect to the first fee award, where the magistrate found that they'd gotten everything that they wanted, and that was the justification for that fee award. We did not have a hearing on the second. And there, it was just, it was confused with respect to the manner in which it was handled because the district court made its determination with respect to one aspect. The magistrate felt bound by that and didn't look at the... But Mr. Murphy can address those. Excuse me one second. The clock. Excuse me, Ms. Clerk. The clock that shows there's no time. Was that the... 20 minutes? What are you going to do about your co-counsel? I don't know, Your Honor. I'm going to ask for leave from my co-counsel to address your questions. All right. Well, we'll give you another five minutes or so. Good morning. Tom Murphy, and representing HP Pavilion Management. May it please the Court, I want to be very quick. Who are you representing? HP Pavilion Management. Oh, okay. And I'm speaking to the attorney's fees appearance. And I think that that's been pretty thoroughly briefed. And I think that I just wanted to emphasize... Without arguing it, Mr. Murphy, just kick off for me the reason why you believe there's something wrong with the award. What are the grounds of your appeal? You don't have to explain it. Just listen. Okay. That the rule 68 offer... That the analysis that the district court engaged in in determining whether the rule 68 offer was more or less favorable than the final judgment was flawed and that it didn't follow an appropriate standard... Okay. What's your next ground? I'm sorry? What's your next ground? That the court in determining whether the rule 68 issue relied on clearly erroneous factual findings, namely that the steps were extremely important to the plaintiffs and to testify that they don't leave it out on the steps for safety concerns. And the steps was one of the portions of the... All right. What's your next ground? And then finally, it's that the magistrate failed to appropriately consider the degree of success that the plaintiffs obtained relative to the litigation goals. If I get your grounds of appeal correctly, two relate to the consideration of the rule 68 offer and the third is error by the magistrate judge in concluding what the degree of success was. Is that right in terms of the grounds you're raising? Almost. It's not that the magistrate erred in concluding the degree of success. It's just that he didn't consider the degree of success and particularly that he didn't analyze the injunctive release that they sought versus... All right. Thanks. I just want you to listen because I don't want to cut into your argument. I just have one question. Am I right in my understanding that the damage case took eight days to try and the injunction case took two days? Yes, that's correct. It was an eight-day jury trial. Were they given a fee award for the time spent in the jury trial? I believe that the magistrate reduced the lodestar by a hundred hours, about $32,000 on account of the jury trial. I would point out that in the injunctive trial, there was one day of evidence. It was about an hour and a half, two hours. Was there a carryover? Did the judge consider the evidence that came up in the jury trial in deciding the injunction case? I think that the predicate for the injunction trial was that there was a violation of the... or that the arena was a public forum for purposes of the California Liberty of Speech Clause, which was, I think, predicated on the jury trial. However, that's a finding that he had made earlier at the time of the preliminary injunction motions. Okay, I understand. He was, I think, quite firm in... I assume you would be willing to at least meet with the mediators also rather than have it remanded and go through this all over again with another award that gets appealed whichever way it comes out. Your Honor, I would echo Mr. Elbaugh's comments on that. I would just briefly mention that we were contacted by the circuit mediator. However, because the plaintiffs were improper, he said it was not appropriate for the circuit mediation program. Well, he may reconsider if we ask him to. If there are no questions, I would otherwise submit it on the briefs. Thank you. Thank you. Good morning, Your Honors. If I may just have 30 seconds of the Court's time. My name is Michael Dotson. We'll give you two minutes. Thank you, Your Honor. I'm Michael Dotson with the San Jose City Attorney's Office. I represent the City of San Jose, which more or less has been along for the ride, so to speak, with regard to this case. We are here as an appellee. The plaintiffs are asking this Court to overturn the jury's verdict and the judgment entered thereon, finding no liability on the part of the city. I'm here to argue two points in support of that verdict. Number one. Is this the $2,000 verdict or whatever it is? No, no, no, Your Honor. The plaintiffs are seeking to impose liability on the part of the city, alleging that at a meeting, which it was undisputed was held. You mean it would require a new damage trial? They're not just asking that you are responsible for a part of the jury verdict. Is that right? They are. What release are they seeking? To make you a party so that you are bound by the jury verdict? They want to overturn. Well, you are a party already, right? We are a party, yes, Your Honor. You've got a verdict in your favor. We've got a verdict in our favor, and that's what. If that were reversed, would that increase the damages that the jury awarded, or would you merely be one of those responsible for the damages? Hypothetically, if the court were to reverse the jury finding of no liability in favor of the city, I would submit it would require remand to the district court for retrial on that issue and determination of what happened. Aren't the damages that the plaintiffs suffered the same, whether you're a party or not? Probably yes. So probably you're arguing about whether you should split the $2,000 with somebody else? It's not only that, Your Honor, because if there was an imposition of liability on the part of the city, hypothetically, the city could be on the hook for the attorney fee award as well, and that's a very important consideration. As I started to say, the plaintiffs seek to impose liability on the part of the city by virtue of a meeting that was held shortly before the circus came into town. There were several members of the San Jose Police Department at this meeting, and in particular there was a colleague of mine by the name of Carl Mitchell who attended this meeting, and it was from that meeting plaintiffs sought to prove that some illegal conspiracy between members of H.P. Pavilion and the city was hatched by which the plaintiffs' civil rights were violated. And the jury found that there was no official, quote, unquote, with policymaking authority present at the meeting to bind the city, even assuming hypothetically there was some conspiracy that existed. And so that even if there was some illegal conspiracy, which we in no way concede, there was no policymaking official with authority to bind the city present at the meeting. Based upon that, we would ask the court to affirm the jury's finding of no liability on the part of the city. Thank you. Thank you. All right.  My name is Marcia O'Connell, and I represent Feld Entertainment, the parent company of Ringling Brothers. We're actually intervening in an appeal. You'll have to speak into that microphone because I can't hear a thing. I apologize. My name is Mar Wiles, and, Colleen, I represent Feld Entertainment, the parent company of Ringling Brothers and Barnum & Bailey Circus. We are intervenors in this appeal. We're actually responding to the appeal that was filed by the appellants, Denise Bobel and Mr. Cuviello. So I can take just a couple of minutes just to make some really brief points now or wait until they've had their chance to speak and then respond. They might as well tell us now. Okay. All right. Certainly. What we're responding to is the appellants have challenged the court's permanent injunction on two grounds. One is the semicircle before the entrance to the animal open house that has about a 10-foot radius. The court set that semicircle as an area that they cannot go into when they're out there protesting the circus. The other thing that the court did is – You like that, don't you? I do. Yeah, we certainly do. All right. The other thing the court did is that it allows the HP Pavilion to prohibit them from putting their video cameras on rods and videotaping into what are essentially private areas and specifically the loading dock into the arena that's surrounded by a 10-foot wall where people are not allowed to go. No member of the general public is allowed to go. It's only open for employees. And the animals are taken in there and kept waiting in there while they're doing the show. So basically we've argued most of this on the papers, but these are private areas that no one's allowed to go into. Their videotaping into that area is a way of going into those areas, and the court prohibited them from doing that or allowed HP Pavilion to prohibit them from doing that because they're non-public forums. The 10-foot semicircle, I think that there's ample case authority that says that you can have restrictions that extend out a certain number of feet from entrances to specific areas because of the number of people that are coming in and out of those areas. It's a very small restriction. There are multiple people coming in and out of the animal open house, and their standing right at the door of that entrance prevents people from being able to easily go in and out. So those were the grounds that we submitted our opinion on. Are you happy if we leave everything as it is? That's correct, Your Honor. All right. Thank you. Thank you very much. Good morning, Your Honors. If it pleases the Court, Joseph Cuviello, pro se. I'm an appellee, cross-appellant in the case, and we filed this because we believe that the injunction is overbroad with respect to the 10-foot semicircle. And contrary to what Marwa said and Ms. Elzencalli, the injunction doesn't specifically state a prohibition on plaintiffs' videotaping, it simply states that the injunction does not intend to permit plaintiffs to peer over walls or barriers, which is a vague concept. Are you happy with it, too? No. The problem with that is, Your Honor. It doesn't prohibit it, does it? It doesn't prohibit it. But the problem is Ringling has already filed twice a contempt motion against us for sanctions based on the preliminary injunction. And because this is vague, it sets... What happened when they filed the motion for sanctions? The judge denied the motion to be heard. All right. But the judge did say in the hearing, when we had a hearing to modify the permanent injunction, that he would uphold a contempt motion at this time based on this permanent injunction. He would, but he didn't? He would, but they haven't filed one since that hearing. So that's why... What are you worried about? Pardon me? What are you worried about? I'm worried about having a motion for contempt filed against me. Well, we can't decide matters in the future if we're here in court to hear cases on what has happened. And if I could predict the future, I wouldn't be a judge. I'd be maybe playing the market now. I'm not sure. I understand that. And my other point on the permanent injunction is that it's overbroad. And one of the reasons it's overbroad, it's addressing an issue in this injunction where there was no violation established. And the case law is clear that this is well settled in framing an injunction that it must be narrowly tailored to address the violation established. The only violation established in this case was the violation of my rights and my coplainant's rights by H.P. Pavilion. There was no liability against us for any of our activity out there. And so this injunction goes beyond that violation established and addresses our videotaping activity and our leafleting activity with respect to the 10-foot semicircle, which, like the north entrance, there was simply no evidence to show that our leafleting activities at the entrance to the animal open house interferes in any way with the ingress and egress of the patrons going in and out of that open house, which is why we ---- It makes you think you've got a right to climb over a wall and take videotaping. I don't climb over walls, Your Honor. Well, get up on a ladder. I don't get up on a ladder, but I did use a pole, like she said.  You mean you put your camera on a pole? Camera on a pole, yes. That's a little different from a ladder, I take it. It's a little different. Not much, though. Not much. But the point is this issue was never tried in the district court, the issue of Ringling's privacy. This was never tried in the district court, so we never got to present evidence that this is not a private area. They never got to present evidence that it was. And under California law, they would have to prove that it was highly intrusive or offensive, our videotaping in that case. And this was never tried, so this is not an issue I think that the appellate court should even address on this at this time. Is this a practical problem now? Are you still trying to put your camera on a pole and film in there? Yes, we do. I mean, now in the future? At this point, are you still trying to do it? Yes. We won't call you a paparazzi, will we? Not yet. So is that it? The poll? The poll, yes, that's it for the permanent injunction. But we also are appealing the judgment with respect to, as the city attorney mentioned, liability to the city. We believe that the city did participate. We're appealing the conspiracy charge with respect to the city, too. There was a meeting between the city attorney. Would there be any more damages than you have? No, just liability at this point, except ‑‑ I'm sorry. Just liability at this point on the part of the city for conspiracy and violation of our rights. But we are also appealing the absence of punitive damages against the HP Pavilion, as the jury did not find reckless disregard for our rights. We think the evidence overwhelmingly shows that they did. What I'm asking is if the city were now held liable, would you get any more than you're getting now? I don't anticipate that. So what do you care? Well, the reason I care, Your Honor, is because this is happening to us all over the place. And the fact that the city is not held liable emboldens other cities to take the same course of action. And this is a problem for us as we move around the Bay Area and the greater Bay Area. Well, are you ‑‑ oh, I'm sorry. Go ahead. When this case was tried, did you have a lawyer? Yes, Your Honor. Mr. Whitney Lay right here. Okay. All right. And so you're arguing pro se? Yes, Your Honor. Are you a lawyer? No, I'm not. Well, you do pretty well. Thank you very much. Thank you. All right. Is that it? Well, we also, with respect to the punitive damages, which I mentioned, and I think that's about it. In the north entrance, I just want to state that I think the case he cited, Costco, is referring to private property. This is government‑owned property, and our evidence, as you noted, shows that there is no interference up there. We submitted pictures and video showing that even when there are lines up there, there's plenty of space in between the lines for people to stand and leaflet patrons as well. In what way does a 10‑foot limitation ‑‑ Pardon me? In what way does a 10‑foot limitation hamper your ability to pass out leaflets to the people? I can't say that it has any real effect in hampering, aside from the way they configure it sometimes. They've recently put out a sign in front of the 10‑foot semicircle, so now we have to move around the sign. If we could stand next to the entrance, it would be a lot easier. We don't interfere. And they cited a case, Edwards, which was a California case about an abortion clinic where they restricted the abortion protesters eight feet from the entrance, two feet less than they want to restrict us here, when there was a protracted history of harassment by the abortion protesters. Here there's no history of that. We've always acted responsibly. And the evidence shows that. We've always acted within the law. We've looked out for not interfering. We made an effort not to do that. Thank you. Thank you. I assume you'd be willing to participate in mediation. Yes, Your Honor, if that's the case. We have done mediation. I don't hold out much hope for it. But I would if the court wanted us to do that. I would definitely be willing to participate in mediation. Wouldn't you rather try to come up with a solution than keep going for the next five years in this case? I understand that, but at this point I think everybody's dug in their heels. The city doesn't want to admit liability. We think they're liable. HP doesn't want to pay attorney's fees. We think they should. Well, whether the city's liable or not, you can determine in some other case maybe. It's really an abstract question. And this isn't the end. We have lots of time for litigation, particularly in the state courts. Yes, I understand. Thank you very much. Okay. You know what they used to say. I've been a lawyer and a judge for some 62 years. A bad settlement often is a lot better than a good lawsuit. Thank you. I'll keep that in mind. I'll keep that in mind. Okay. Still the morning. Good morning, Your Honors. My name is Whitney Lay, and I represent Denise Boebel. I also was trial counsel in the underlying case. There are several points that the Court's already raised that I'd like to address. I just want to go over three points that I think are important, state them briefly, and then go into them in more detail. First of all, this is a case that has always been about injunctive relief. This is a case in which the plaintiffs sought in litigation two different preliminary injunctions, then went through an eight-day trial at which they introduced evidence, which was the overwhelming evidence that the Court relied on in fashioning the injunction. Did you argue this case to the jury? I did. How much damages did you ask for? I believe we asked for $25,000. I'm not sure of the precise amount. Well, actually, you got a whole, you know, $25,000, a lot of money. In retrospect, it's a lot less, a lot more. You won a lot more than that you actually got. Actually, that's not the case, Your Honor. Mr. Uphouse made an interesting point. He said, we always accepted that this was an extreme violation of the plaintiff's rights. We knew that all along. And we were just, the only issue was we couldn't reach a settlement. That's not the case. Mr. Uphouse's client, H.P. Pavilion, insisted on denying whether or not a violation of the law took place and whether or not my client's rights were violated. And in addition to denying that violation, he insisted on an injunct, a protocol that would only apply to the circus. Wait a minute. When you tried your case, this was after you had the Rule 68 on offer. That's correct. In the trial of the case, I've asked you how much you wanted for damages. And now I want to ask you, what was the defense? Did they deny any liability at all and claim that your clients did not have any First Amendment rights to pamphlet and so forth in the suit before the jury? No. They claimed that my client, that in the incident that underlied the case, that no rights were violated. That was absolutely their case. They did not come to the jury and say, some rights were violated, but we're suggesting a new protocol. What they said is the arrest was justified. That's right. That's right. And we had to litigate that. So we've achieved two things. One, we've achieved greater injunctive relief. But as Judge Reinhart pointed out in the Morales case, we also obtained a judgment that what took place and what happened to my clients was a violation of the law. And that's going to redound to the benefit, not just of my clients, but of anyone else who could be similarly treated elsewhere. This is a very closely watched case. What this court does in this case is extremely important. Other police departments have come to San Jose and are closely watching this decision because this is, as Mr. Cuviello pointed out, this is a pattern. The issue of how animal rights protesters are treated is being repeated in stadiums all across the state. Well, I know this part. You were not in the case when the settlement was accepted by the other people. I was in the case at the time that my clients, I came into the case because my clients would not agree to the settlement. That's when they hired us because the other. You were not in the case when the offer was made. That's correct. Your clients said, no way. We're not. We're not. This is not a fair offer. You're right, Your Honor. And I think with respect to that issue. Was the fair offer really aimed at the injunction or was it aimed at the money? Oh, no. No question. It's always been about the injunction. And this is one point I think it's important to point out here. What they've argued in their papers is essentially that a rule C8 offer can operate as a means to enable a defendant to purchase the right to violate someone's civil rights. Because if you adopt their reasoning, whenever a defendant with greater resources than the plaintiff makes the determination that they want to deny someone their rights, our Constitution guarantees them, they can essentially get a license to do that by offering them a rule 68 offer that is in excess of the money they can obtain in damages. That's why I asked the questions about whether the jury trial affected the injunction, and obviously it did. There's no question it did. It did. There's no question. If the jury had given you a zip, it would have been a different case. Your Honor, in this case, there's no question that this case has always been about injunctive relief. Yes, my clients had damages. Yes, they offered my clients $2,600 more. But if the question is whether or not my clients would have given up the rights that they obtained in order to obtain the $2,600 more than their offer? How much of the eight-day trial was related to your client's First Amendment rights as compared to damages? Every day, and I can explain why. The jury trial was focused on evidence establishing that there was a content-based discrimination. That was important to the court's injunctive relief, because the court recognized that the protocol that the defendants were offering, they were offering only for the circus. Imagine a defendant that says, we're going to have a congestion problem, not when the Sharks are in the playoffs, but only during the circus. We brought in testimony. The judge actually went out and took the jury to the North Landing, and we did a walk-through through the trial. And this judge spent a lot of time focusing on the evidence. We showed videotape. Every day, we had videotape evidence of the areas where the injunction is covered. And so although there was a two-day injunction trial, that was almost exclusively based on supplementing the record that we had already established. All those videotapes, are they in the record? I believe they are. They're not probably up in the appellate record, but they are in the record we get. Yes, they are. Let me ask you a couple of things. There's no ‑‑ for the other events at the arena, there are no restrictions on pamphleteering? No, no, this is one of the points that came up. That's fine. I just want to know what the facts are. Yes, that's true. There is no limitation. Do your clients or former clients hand out literature at those other events or just at the circus? They only hand out literature at the circus. Their focus is the mistreatment of animals and their attempt to document the mistreatment. Sharks. No, they aren't. Not those sharks, at least. My point was merely that the notion that a protocol that's created solely for the purposes of a circus of protesters. If the only people who protest are at the circus, that might be an explanation. That's one possibility. I think another possibility is that there has never been any real congestion problem and that there is a different ‑‑ there's something different. At the other events, there's nothing similar, is there, to the area where you have the ten-foot restriction? That's where the animals are kept? It's my understanding that there is no other event similar to the animal open house. I'm not aware of any, but that would be. So there's no difference in the treatment between the plaintiffs in this case and in any other because there are no similar events where picketing might be limited? Well, I think that that is true, except that there is no ‑‑ there is no any other event in which, at least as of the time of this trial, there was any other protocol for any other event. And as with the north entrance, there was no evidence introduced of any interference. There is a reason why these restrictions are being placed, and that is because my clients have been extremely effective at documenting animal mistreatment and informing the public. At the injunction trial, what did the jury do? What did they find? Did they find you were just entitled to an injunction, or did they fix the terms of the injunction? What did they do? No, they found the terms of the liability for the claims and the damages. The court then, based on those rulings, made its determination as to the injunction, relying on the evidence during the jury trial and the additional evidence presented during the bifurcated second phase. The bifurcated trial was just before the justice. That's correct. I'm going to ask this stupid question because I'm from North Dakota. Now, the San Jose Sharks, is that a hockey team? It is. I'm not a hockey fan either. Because that's ‑‑ hockey is my background. Okay. There you go. Okay. Mr. Lay, tell me what injunctive relief you obtained by going to trial that was not offered in the free speech protocol. I think the primary access is the north entrance, the full access to the north entrance. We also obtained access to the entire north entrance. I think it's important for the court looking at defendants' arguments not to be ‑‑ Anything else besides access to the north entrance that you got by going to trial that was not offered? Well, in addition to that, we also ‑‑ I mean, that was the primary relief in what we were ‑‑ Did they say anything else? Well, we also got access to the steps as well. You wouldn't have had access to the steps under the free speech protocol? That's correct. Now, what detriment did you suffer by going to trial? In terms of detriment, I believe that my clients certainly did not receive any detriment. I mean, their rights certainly are advanced. Well, what about the, you know, this limitation on the videotaping? Was that in the free speech protocol? No, that was not in the free speech protocol, but I don't think ‑‑ In the injunction. Yes, but I don't think that that could be fairly read to be a detriment to my clients. This court's already ‑‑ It's not an advantage. He doesn't like it. He just said he didn't like it. Yeah, but I don't ‑‑ I understand that that's true, but the fact that my clients don't like the fact that the court described areas to which the injunction does not apply, does not create any detriment to my client. All the court said in the injunction is that I am not extending the injunction to deal with this. Except he just said that, you know, at one of the hearings, the district court said he's going to hold him in contempt in the permanent injunction. That's regrettable, but a district court subsequent ‑‑ Well, if it's regrettable, it's a disadvantage. No, actually it's not, because it has no ‑‑ It doesn't do him anything he wants. But as a matter of law, a district court subsequent interpretation of inferences that could be drawn from his order can't contradict the order itself. And as the Ringling felt ‑‑ You don't know whether ‑‑ yet whether they suffered a detriment, but if that ultimately stands up as the interpretation of the injunction, then it would be a detriment. Well, I don't think that ‑‑ I think that the court ‑‑ I think that that is certainly true, but I think that as Mr. Cuviello pointed out, that's the fact that a potential detrimental term is included in an injunction where only the plaintiffs have obtained relief. It speaks only to the issue of whether or not that term should be excluded, not as to whether or not plaintiffs' ability to be deemed the prevailing parties because of what they did obtain. Well, it's not a matter of whether they're prevailing parties. It's a matter of, you know, how much more did they get by going to trial. In other words, you know, it's a matter of how much the degree of success they obtained. Well, Your Honor, this is something that both the magistrate judge and the court spent an extensive amount of time. The judge didn't consider this. Yes, he did. Well, what did he say about the videotaping? No, he did not discuss the issue of the videotaping. He didn't consider it. Yes, but I don't think that the inclusion of the discussion of the videotaping can be treated as a detriment in this analysis because for two reasons. Number one, it was never an issue that was placed during the trial. It was never an issue. And to the extent that it could be read to apply to my clients, it would be unlawful. Is that Ms. Bobo? They're saying the injunction is unlawful as to them, so should we decide whether they, you know? No, no. Look, there is no question. We do have an agreement that we're both. But the fact that we are both seeking to overturn the injunction doesn't mean that neither of us is right. And in this case, what the courts already, I think, observed is that in order to impose an injunction, you need to have evidence. And there was no evidence of congestion or interference, and the court rightly made the determination that there should be no restriction at the north entrance. However, there also was no evidence of interference around the Animal Open House. And although, in retrospect, you can argue about whether or not, how significant a restriction it is, I don't think that's the court's inquiry. The court's inquiry is did the defendants make any effort to introduce any evidence, a scintilla of evidence, to give the court a reason why it should restrict someone's free speech rights? And they just didn't. Well, I've got two things to ask you. The first question I'm going to ask you is how much difference is there between the Rule 68, the protocol, and the rights that your clients have under that protocol for effective communication, and what additional rights did you get, in fact, by the injunction, which as far as I can see is that you don't have the 20-feet restriction at the entrance? It's extremely significant. The reason why, and if I could answer the question with an observation, the reason why I would submit, the reason why these restrictions are being only imposed is not because, is because my clients are being successful in certain areas, and it's in Ringling's interest to prevent my clients from gaining access to those individuals. I represent Ms. Bobel. I want to answer the correct one point that Mr. Cuviello made speaking to this court earlier, because Ms. Bobel is the person who has spent most of the time. You're here only on the attorney's fees. That's the only brief you signed, right? That's correct. Well, you can't argue her other case, then. Okay. Well, to the extent that the issues are overlapping, I wanted to address one point. Ms. Bobel also is here, and she can address that issue if the court will give us time. Well, this issue really goes to attorney's fees, you know. You're here on attorney's fees, and I want to know what difference there was between the protocol under Rule 68 in fact and what you got, which, as far as I can see, the only difference is the 20 feet is out. And it's subject to some vague language of the judge about protecting the right of the ringling and the other people if it gets congested. Well, Your Honor, I would not minimize that right. I think that the right to access to the North Entrance is extremely important, because that's where my clients have the most opportunity. They're only a handful of people. They're two, maybe three people. Their ability to reach people at the areas where they can intersect with them is vital. It's crucial. Your people want to be there when the customers are going up the steps and just before they enter the building. That's where they're effective. They give them a pamphlet. The point is that it's an area where one person can reach several people. Where there's a wide area and you can spread out people so that one person would have to run and run and run. The parking lot is not so good. The parking lot is not so good. Too many people. That's right. But being able to put a, well, I don't want to go into what you can do. I understand your position. Thank you. Okay. Your Honor, I do. Your time is, Ms. Bogle is going to talk. Your time is well past. Right. Okay. Thank you. All right. I assume you're willing to meet with a mediator also. If it pleases Your Honor, my name is Denise Bogle, and I'll make this very brief. But I wanted to talk to the Rule 68 offer and the difference about having access within that 20-foot area. I'm personally affected by that because that's the area I leaflet. And I can also talk to the 10-foot setback at the Animal Open House. How many of you are there? Sometimes it's just me. Sometimes it's just me. Sometimes I can have two people. We're all volunteers. It's not a large group of people. No, sir. I mean, what's a large group? If we're lucky, we get 15, 20 people to cover the whole thing. But some days it's just five or six of us. So, you know, it really varies. And that's why access adjacent to the entrance is so vital to my ability to communicate a message. And I can tell you, being able to hand someone a leaflet and make eye contact, it's vital to having people feel comfortable to take it. And that I wanted to also point out, we have 11 years of evidence in this case, 11 years of evidence until we filed our lawsuit of no problem of any activist causing. You say that. You're not a witness. You're not a lawyer. You know what they say about a person who represents himself, don't you? No. Okay. Well, I won't tell you. Your lawyer will tell you. But you have to refer for me and for the others. But what's in the record? Like, if you're saying we got 11 years, the 11 years on the videotapes will show such a thing. Okay. So it's in the record that there have been 11 years of activists at the facility with no interference, no obstruction of the ingress or egress of the patrons or any disruptions. I wanted to also point out that this case has never been about money, and this is on the record, that this case has always been about rights and the ability to access the patrons. And that's the reason holding the city liable in this case is so important to plaintiffs or appellants. Also, I wanted to say about the videotaping, as already has been stated, that it's never been tried. I mean, we haven't even had a day in court about this issue. That's the primary reason we've stated on the record our opposition to the preliminary or the permanent injunction as it is, because we didn't have a day in court on this issue. What's said about that? I'm not sure. What's in the injunction about videotaping? It says nothing in this injunction shall permit plaintiffs from peering over walls into private areas. Permit them to? Yes, correct. So it's not a prohibition. It's not a prohibition, but then what happened in court is that the judge then took it further. That's not written in the order, right? It's not in the injunction. But in court he said that he did not want us to peer over walls and that if we came back and if they filed a contempt of court, that he would find us in contempt if we did it. And we had my attorney, or he wasn't my attorney, but Mr. Whitney Lay received a letter from Ringling Brothers Marwa stating that they had plans to find us in contempt of court just in the last year. And so we have this threat hanging over us, and it does impede. You're a good advocate yourself. I think you could defend yourself pretty well. Except for Patton is the law better than I do. But so there it is. Thank you. Thank you very much. I think you've used your rebuttal time. One minute. First of all, with Judge Tashima's question, the what they got was 20 feet, which was That's the main action. It's at the landing. The protocol said a 20-foot setback, and that left the rest of the landing for expressive activities, from Ms. Bobo to contact, all of the people coming up there. And you look at the photographs, and it's pretty clear that you can access everybody in a relatively small area, so they're all there. The suggestion, I think that Mr. Lay said there was no evidence. The evidence of congestion, which the district court found, was replete. And you look at the photographs. As I said, they're worth a thousand words. The photographs show the congestion at the top of the landing. And that was why we came up with the protocol the way we did. With respect to the videotaping, what the injunction says. The injunction essentially adopted the terms up. We're way, way over. I'll submit the matter. Thank you, Your Honor. Thank you for your attention. Thank you all very much. It's been very interesting. We've had a nice, enjoyable argument. And the case, just argued, will be submitted.
judges: Reinhardt, Tashima, Bright